**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 8, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

KATHRYN KAISER,

Defendant - Appellant.

No. 12-2133

(D. N.M.)

(D.C. No. 1:11-CR-02421-BB-1)

**ORDER AND JUDGMENT**[*]

Before **PORFILIO**, **ANDERSON**, and **BRORBY**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Defendant and appellant Kathryn Kaiser pled guilty to stealing the contents of pieces of mail while she was a postal employee, in violation of 18 U.S.C.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

§ 1709. She was sentenced to three years of probation, and required to complete six months of location monitoring, for which she was obligated to pay in whole or in part. Arguing that her sentence is procedurally unreasonable, Ms. Kaiser appeals her sentence. We affirm.

## BACKGROUND

At the time of the events relevant to this appeal, Ms. Kaiser had been employed by the United States Postal Service ("USPS") as a postal clerk for a total of sixteen years. On April 8, 2010, Postmaster Vicki Voyles contacted the USPS Office of the Inspector General ("OIG"). Ms. Voyles told a special agent with the OIG that several clerks at the Edgewood, New Mexico, Post Office had observed Ms. Kaiser take and rifle through first-class mail. On May 18, 2010, an OIG agent interviewed Edgewood postal clerk Kay Mayoora, who stated that she first noticed Ms. Kaiser rummaging through the mail at the Edgewood Post Office on April 5, 2010. Ms. Mayoora stated that, although she had seen Ms. Kaiser take numerous pieces of mail, she only documented a few instances. More specifically, Ms. Mayoora reported that, on April 26, 2010, she saw Ms. Kaiser take pieces of mail from the "hot case" (container holding mail to be sorted) and later return them. Ms. Mayoora retrieved the mail pieces, which had been taped shut, and photocopied them. Ms. Mayoora gave two of those copies to Ms. Voyles, who forwarded the copies to OIG.

Ms. Mayoora also reported that she had seen Ms. Kaiser handle colored envelopes and take them into the bathroom. She thereafter stated she could hear the sound of envelopes tearing. At one point, Ms. Mayoora and another clerk planted envelopes on the bottom of a mail tub that Ms. Kaiser later took to sort. Ms. Mayoora later saw the "planted" envelopes on Ms. Kaiser's desk. Ms. Kaiser turned the envelopes over and covered them. Ms. Mayoora reported that she last saw Ms. Kaiser take a piece of mail on April 24, 2010.

The OIG agent also interviewed Edgewood postal clerk Steve Mitchell. Mr. Mitchell reported that he, too, had seen Ms. Kaiser take colored envelopes (presumably containing greeting cards) from the collection bin and "raw" letter trays. More specifically, Mr. Mitchell stated that on April 10, 2010, at approximately 6:00 a.m., he saw Ms. Kaiser stop sorting parcels and go through a letter tray. She removed three or four colored envelopes and walked to the women's bathroom. Ms. Kaiser returned a few minutes later without the envelopes. Mr. Mitchell identified copies of envelopes he had recovered and which he believed Ms. Kaiser had rifled through. Mr. Mitchell also stated that he had not actually seen Ms. Kaiser open or take anything out of an envelope, but that he believed she had done so, based upon his observations.

On June 28, 2010, OIG agents prepared and placed three test pieces of mail containing marked $20 bills at the Edgewood Post Office . A short time later that same day, an OIG agent asked the acting Postmaster at the Edgewood facility,

Penny Cline, to retrieve the three test mail pieces. Ms. Cline was only able to find two of the three test pieces. Ms. Kaiser had sorted collections mail that day. Furthermore, Ms. Cline reported that a $20 bill was found on the Post Office floor and Ms. Kaiser claimed it was hers, stating it had fallen out of her clothing.

The investigating agents interviewed Ms. Kaiser that same day (June 28). She admitted to stealing and rifling through first class mail beginning in early April 2010. Ms. Kaiser stated that, at one point, she was taking three to four pieces of mail per day, and that Wednesdays were particularly "productive" for her because she sorted collections on that day. She stated that she targeted birthday cards and she took money because she needed money for groceries and other essentials.[1] Ms. Kaiser said she did not steal gift cards, as she thought they were traceable. She admitted to flushing the OIG test piece envelope down the toilet. Ms. Kaiser then gave the OIG agents a sworn statement admitting to taking cash from an open envelope. She reported that she began stealing in April and ended towards the end of June. She estimated that she took a total of between $300 and $500.

On June 29, 2010, the OIG agents reviewed video footage taken on June 28, 2010, at the Edgewood Post Office. The video showed Ms. Kaiser opening a

---

[1]Ms. Kaiser reported that she was in dire financial straits at the time she stole the pieces of mail. Among other things, she was the sole financial support for her family, inasmuch as her husband had suffered an injury at his employment and was on disability; Ms. Kaiser had lost much of her savings to a gambling addiction; and her house was in foreclosure.

piece of mail at 12:16 p.m., placing an item in her right pocket, and concealing the envelope under her apron.

According to the OIG agents, the USPS did not suffer a loss as a result of the offense. There were, however, a number of complaints from customers who reported that their mail had been rifled through or was missing. The agents were unable to identify specific victims. Although one person reported stolen checks from her mail, Ms. Kaiser never admitted to taking any checks.

Ms. Kaiser pled guilty to the indictment on January 26, 2012. In preparation for sentencing under the advisory United States Sentencing Commission, Guidelines Manual ("USSG"), the United States Probation Office prepared a presentence report ("PSR"), which was subsequently amended and re-disclosed. The PSR calculated a total offense level of ten, which included a four-level enhancement pursuant to USSG §2B1.1(b)(2)(B) because the offense involved fifty or more victims. With a criminal history category of I, the PSR recommended an advisory sentence range of six to twelve months.

Ms. Kaiser objected to the PSR, arguing that the four-level enhancement was incorrect, claiming there is "no evidentiary support for this enhancement." Add. to PSR, R. Vol. II at 40. She also filed a Sentencing Memorandum, in which she stated that, while she had "no objection to any of the factual statements contained in the [PSR]," she did object to the four-level enhancement for fifty or more victims because, once again, she averred there was "no evidentiary support

-5-

of any kind" for the enhancement. Sentencing Mem. at 2, R. Vol. I at 17. The Sentencing Memorandum then went through the evidence, as detailed in the PSR, in an effort to show why a four-level enhancement for more than fifty victims was improper: "In sum, since there have been no victims identified by Ms. Kaiser's alleged wrongful conduct, there is no evidentiary support for an enhancement for more than fifty victims under U.S.S.G. §2B1.1(b)(2)(B)." Id. at 19-20.

At sentencing, Ms. Kaiser reiterated her objection to the enhancement, and asked for a "noncustodial sentence . . . for the reasons set forth in the sentencing memorandum." Tr. of Sentencing at 3, R. Vol. III at 3. She went on to state, "whether or not the Court applies the enhancement for 50 victims and varies downward, or does not and arrives at an offense level of 6, in either case, [I] ask the Court to impose a noncustodial sentence." Id. The government conceded it could not specifically identify a particular victim, but agreed with the PSR that the fifty-victim enhancement applied, and indicated that it left the question of incarceration or not to the discretion of the court.

The district court overruled Ms. Kaiser's objection to the four-point enhancement, finding her offense level to be ten and her criminal history category to be I, yielding an advisory Guidelines sentence of six to twelve months. The court departed down, sentencing Ms. Kaiser to three years probation and it included as a special condition the requirement that Ms. Kaiser "participate in and

successfully complete a location monitoring program for a period of six months" to be paid, in all or part, by Ms. Kaiser. Id. at 7.

This appeal followed, in which Ms. Kaiser argues her sentence is procedurally unreasonable because the district court erred in applying the fifty-victim enhancement.

**DISCUSSION**

We review sentences for reasonableness under a deferential abuse-of-discretion standard. See United States v. Alapizco-Valenzuela, 546 F.3d 1208, 1214 (10th Cir. 2008). "'Reasonableness review is a two-step process comprising a procedural and a substantive component.'" Id. (quoting United States v. Verdin-Garcia, 516 F.3d 884, 895 (10th Cir. 2008)). See Gall v. United States, 552 U.S. 38, 51 (2007). Procedural review "asks whether the sentencing court committed any error in calculating or explaining the sentence." Alapizco-Valenzuela, 546 F.3d at 1214. In determining whether the district court correctly calculated the applicable Guidelines range, "we review factual findings for clear error and legal determinations de novo." United States v. Wilken, 498 F.3d 1160, 1169 (10th Cir. 2007). Ms. Kaiser only challenges the procedural reasonableness of her sentence, inasmuch as she challenges the district court's inclusion of the fifty-victim enhancement when calculating her advisory Guidelines range.

USSG §2B1.1(b)(2)(B) provides for a four-level enhancement if the offense involved fifty or more victims. "The government carries the burden of proving by a preponderance of the evidence that an enhancement is appropriate." United States v. Delossantos, 680 F.3d 1217, 1219 (10th Cir. 2012) (further quotation omitted). For purposes of §2B1.1(b)(2), when undelivered United States mail has been taken, a victim is defined as including "any person who was the intended recipient, or addressee, of the undelivered United States mail." USSG §2B1.1 comment. (n.4(C)(I)).[2]

The commentary to that USSG provision further includes a "special rule": "A case described in subdivision (B)(I) of this note that involved a Postal Service (I) relay box; (II) collection box; (III) delivery vehicle; or (IV) satchel or cart, shall be considered to have involved at least 50 victims." USSG §2B1.1 comment. (n.4(C)(ii)(I)). The Sentencing Commission has indicated that it provided this special rule "because of (i) the problems often attendant to such offenses, (ii) the frequently significant, but difficult to quantify, non-monetary losses in such offenses, and (iii) the importance of maintaining the integrity of the United States mail." USSG app. C, Amendment 617.

"We must treat this commentary as 'authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous

---

[2]The Guidelines contain other definitions of victim, which are not relevant to this appeal.

reading of, that guideline.'" <u>United States v. Butler</u>, 694 F.3d 1177, 1181 (10th Cir. 2012) (quoting <u>Stinson v. United States</u>, 508 U.S. 36, 38 (1993)). Despite Ms. Kaiser's allegation that the application of the enhancement violated her due process rights, we find that the application of the special rule does not violate the Constitution or in any way violate Ms. Kaiser's rights.

Ms. Kaiser argues that the district court erred by treating the "presumption" contained in the commentary's special rule to be "conclusive and declin[ing] to consider evidence suggesting its inappropriateness in this case." Appellant's Reply Br. at 6. We have read the entire record in this case, including the PSR and the transcript of Ms. Kaiser's sentencing hearing, and we conclude that the district court did not, in fact, treat the fifty-victim presumption as conclusive. Rather, the court simply applied that presumption to the evidence in this case. For example, when Ms. Kaiser stated her belief that "there is no factual support in the record" for the four-level enhancement, the court responded as follows:

> Well, I disagree with that. I'll go on the record and say that I have found that [the government's] interpretation and the probation office's interpretation of the statute with regard to the transfer box, hot box, qualifies under the language of the statute for the intent of the statute to determine that . . . 50 victims were involved.

Tr. of Sentencing Hr'g at 10-11, R. Vol. III at 10-11. The court clearly indicated its disagreement with Ms. Kaiser's view that there was no "factual support" for the enhancement.

Furthermore, the court did not prohibit Ms. Kaiser from arguing the inapplicability of the fifty-victim enhancement. She argued the point vigorously in her Sentencing Memorandum and specifically reiterated that argument at the sentencing hearing. Disagreeing with her assertion does not equate to denying her the opportunity to support her assertion. In short, the government carried its burden in this case and the district court did not clearly err or erroneously interpret the Guidelines in applying the enhancement in question.

Having determined that the sentence imposed was procedurally reasonable, we affirm Ms. Kaiser's sentence.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the sentence in this case.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge